# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| NEXEN PETROLEUM OFFSHORE U.S.A. INC. | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:17-CV-02699 |
| MCMORAN OIL & GAS LLC | § § § | |
| Defendant. | § | |

---

## DEFENDANT MCMORAN OIL & GAS LLC'S MOTION TO DISMISS

---

McMoRan Oil & Gas LLC ("McMoRan") seeks dismissal of Nexen Petroleum Offshore U.S.A. Inc.'s ("Nexen") breach of contract action for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In support thereof, McMoRan states as follows:

## I. INTRODUCTION

This lawsuit stems from an injury that allegedly occurred *21 YEARS AGO*. According to Nexen, it is entitled to seek compensation from McMoRan for 1,439,821 MCF of gas that Nexen alleges was removed improperly from its predecessor's gas imbalance account in *1996* (yes, 1996). *None of the parties involved in the relevant transaction are named in this lawsuit.* Instead, Nexen seeks redress against McMoRan, a stranger to the involved occurrence, demanding that McMoRan pay Nexen millions of dollars for an injury that *to Nexen's and its predecessor's knowledge occurred decades ago.* Nexen offers zero justification for the lack of diligence in prosecuting its stale claim. There is no justification. Consequently, under all legal theories, and

even taking Nexen's allegations as true, Nexen's claim should be dismissed pursuant to Rule 12(b)(6). The claim is barred.

## II. BACKGROUND

### A. The Operating Agreements and Gas Balancing Agreements for the relevant blocks.

Nexen's claim against McMoRan concerns gas produced "from two co-owned offshore oil and gas leases," which have now expired: (1) OCS-G 02366 covering High Island Block 474; and (2) OCS-G 02372 covering High Island Block 489 (collectively, the "HI 474 and 489 Blocks" or "Blocks"). (Pl.'s Comp. ¶¶ 1-3.) In 1973, the working interest owners of the leases covering the Blocks entered into Operating Agreements ("JOAs") to govern the exploration and development of the Blocks, as well as production from the same. (*See* JOA for Block 474, attached at Ex. A ("Ex. A"); *see also* JOA for Block 489, attached at Ex. B ("Ex. B").) As contemplated and permitted by the JOAs, in 1988, the working interest owners also entered into Gas Balancing Agreements for each of the Blocks (collectively, "GBA") "to permit each Party to produce and dispose of its interest in the gas production from the [Blocks] with as much flexibility as possible. . . ." (*See* GBA at 1, at Exs. A and B to Pl.'s Comp.) The GBA references and expressly states that it is part of the parties' JOAs. (*Id*. at 1 (defining Operating Agreement as the "Operating Agreement dated August 1, 1973 to which this Gas Balancing Agreement is made a part [t]hereof").)

As Nexen alleges, the GBA allows working interest owners to "account to the other working interest owners in the event a working interest owner overproduces its share of gas from a particular offshore block" and in effect, takes another working interest owner's share of production. (Pl.'s Comp. ¶ 9.) For transparency purposes and to provide working interest with knowledge about their gas imbalances at all times, the GBA requires gas imbalances to be reflected and accounted for on a regular basis. Specifically, the GBA *obligates* the operator "to furnish

*monthly*, to each [working interest owner], a statement showing the status of all over and short accounts by Pricing Category" (the "Gas Balance Statements").  (GBA at 6, Exs. A and B to Pl.'s Comp. (emphasis added).)  In a nutshell, the Gas Balance Statements reflect the extent to which each working interest owner is either underproduced or overproduced on a cumulative basis.  (*See id.*)

**B.     The alleged wrongful conduct and injury occurred over two decades ago.**

Nexen's claim against McMoRan centers on alleged conduct that occurred ***over twenty years*** ago involving gas produced from the HI 474 and 489 Blocks.  According to Nexen, ***in 1995***, Phillips Petroleum Company ("Phillips"), then the operator of the Blocks, and Nexen's alleged predecessor-in-interest, Canadian Occidental of California, Inc. ("Canadian Occidental"),[1] entered into a gas imbalance settlement agreement ("Settlement Agreement") to settle and release each other from existing gas imbalances for certain gas-producing blocks.  (Pl.'s Comp. ¶ 10.)  Nexen alleges, in conclusory fashion, that the HI 474 and 489 Blocks were not part of the Settlement Agreement and that imbalances for those Blocks never were settled.[2]  (*Id.* ¶ 11.)  Notwithstanding, Nexen claims that, ***in 1996,*** Phillips improperly adjusted Canadian Occidental's underbalance for the HI 474 and 489 Blocks, removing and transferring Canadian Occidental's entire existing underbalance to Phillips's account.  (*Id.* ¶ 12.)

---

[1] Nexen alleges it was "formerly CXY Energy Offshore, Inc. . . . , [a] successor-in-interest to Canadian Occidental of California, Inc."  (Pl.'s Comp. ¶ 9.)  It is unclear from Nexen's allegations whether CXY is a corporate successor to Canadian Occidental or a successor in title.  For purposes of McMoRan's statute of limitations' argument, this lack of clarity is irrelevant, but, for other purposes, it is plainly relevant, and McMoRan does not here waive any arguments in connection with the same.

[2] McMoRan cannot determine if this is accurate; it was not a party to the Settlement Agreement, other potential settlement agreements or other settlement discussions between Canadian Occidental and Phillips, which may support or contradict Nexen's assertion that the underbalances for the two Blocks were not settled in 1995.  And, despite its cornerstone purpose, Nexen did not attach the Settlement Agreement to its Complaint because it is very, very confidential. (Pl.'s Comp. ¶ 3, n.3.)

According to Nexen's allegations, in the face of this alleged improper transfer, Canadian Occidental and its successors, including Nexen, failed to object in any manner despite the receipt of over 20 years' worth of monthly Gas Balance Statements reflecting that the imbalances for the Blocks had been entirely removed as though they, in fact, were covered by the parties' settlement arrangements. While, for purposes of this Motion, the Court must accept all well-pleaded allegations of fact as true, it need not and should not accept unsupported conclusory statements as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, when an unsupported allegation fails common-sense scrutiny, it is "not entitled to the assumption of truth." *Id.* Here, Nexen's threadbare, unsupported allegation that the HI 474 and 489 Blocks were not part of the parties' 1995 settlement--whether under the referenced Settlement Agreement or under another one of multiple agreements collectively designed to clear-up the parties' existing gas imbalances—flunks (or, at the very least, certainly appears to fail) the common-sense test because, after Phillips removed the HI 474 and 489 imbalances entirely from Canadian Occidental's account, all parties in interest engaged in a decades-long course of conduct that indicated that the removal was proper.

The crux of Nexen's complaint is alleged in Paragraph 12 of its Complaint:

> Notwithstanding the fact that the gas imbalances for HI 474 and 489 were not settled in 1995, **in January 1996**, Phillips, as the operator for HI 474 and 489, adjusted [Canadian Occidental's] gas imbalance account for HI 474 and 489 as if such blocks were part of the Settlement Agreement: it removed the entirety of [Canadian Occidental's] underbalance, as of December 31, 1992, and transferred the full volume to Phillips' working interest.

(Pl.'s Comp. ¶ 12 (emphasis added).)

The alleged discrepancy was not a small shifting of a gas imbalance between working interest owners, but rather, as Nexen alleges, a "significant" error resulting in the complete deletion of Canadian Occidental's underbalance attributable to the Blocks. (*Id.* ¶¶ 3, 9 (describing the imbalance as "significant" and the adjustment as "improper").) Nexen alleges that the HI 474

Block was adjusted from an underbalance of 476,000 MCF to an overbalance of 42,748 MCF and that the HI 489 Block was adjusted from an underbalance of 858,035 MCF to an overbalance of 63,038 MCF, for a total combined "improper" adjustment of 1,439,821 MCF in favor of Phillips and to the detriment of Canadian Occidental. (Pl.'s Comp. ¶ 17; *see also* Pl.'s Comp. Ex. C-1, Dkt. 1-3, at 5, 7-11, 17-23.)[3]

Though neither McMoRan nor the Court can know at this point what the Settlement Agreement said, whether other similar agreements may exist or why Phillips allegedly removed the underbalance, it is certain that Canadian Occidental had full knowledge of the alleged "improper" and "significant" adjustments and physical possession of documents "clearly" reflecting these alleged errors *in 1996*, accepting them as accurate. Nexen is unequivocal on this point: "*The attached operator statements clearly show these improper adjustments*." (Pl.'s Comp. ¶ 12; *see also* Pl.'s Comp. Ex. C-1, Dkt. 1-3, at 7, 35.) And indeed, the alleged removal of Canadian Occidental's gas underbalance is clear on the face of the December 1995 and January 1996 Gas Balancing Statements attached to Nexen's Complaint, both of which are date stamped as generated on January 1996 and March 1996, respectively, and none of which Nexen disclaims Canadian Occidental received in 1996. (Pl.'s Comp. Ex. C-1, Dkt. 1-3, at 10-11, 18-23.)[4]

Despite this alleged and glaring discrepancy of almost a million and a half MCF of gas, Canadian Occidental and Nexen inexplicably sat on this information for *21 years* and did……..NOTHING. Nowhere in its Complaint does Nexen allege that it or Canadian Occidental notified or even attempted to notify Phillips or either of two successor operators of the Blocks,

---

[3] The cited page numbers are located at the top of each page of Plaintiff's exhibits, reflecting the page numbers stamped by the clerk upon filing and docketing of Nexen's Complaint and exhibits.

[4] The date and time upon which each Gas Balancing Statement was generated is indicated at the top right hand corner of the statements. (*Id.*)

Newfield Exploration Company ("Newfield") and McMoRan, of this deficiency. Nor does Nexen assert in its Complaint that either Canadian Occidental or it attempted in any manner to correct the alleged improper removal of the entire gas underbalance from the records at any time prior to 2016. Not once. Indeed, the first time Nexen alleges it ever raised the issue was in September 2016, when it sent a demand letter to McMoRan demanding compensation for the imbalance, but offering zero justification or explanation for the ***21-year delay*** in asserting its claim.[5] (Pl.'s Comp. ¶ 19; Pl.'s Comp. Ex. C-1 and C-2.)

**C.    None of the parties involved in the 1996 transaction are involved.**

Reflective of the generous time gap between the alleged wrongdoing and Nexen's Complaint, neither the supposed wrongdoer nor the wronged company are even parties to this action. The alleged wronged company, Canadian Occidental, is not involved. And the wrongdoer, Phillips, is not named. Nor is Newfield, the company that acquired Phillips's interest in the Blocks and from whom McMoRan subsequently acquired its interest. Indeed, as noted in the below chronology of events, as alleged in Nexen's Complaint, McMoRan is two operators and at least 12 years removed from the alleged wrongdoer and wrongful conduct:[6]

- 2/1995:    Phillips is operator and Canadian Occidental owns a working interest in the Blocks

- 2/1995:    Settlement Agreement between Phillips and Canadian Occidental

- **1/1996:        Phillips improperly removes Canadian Occidental's gas underbalance**

- **3/1996:        Gas Balancing Statement "clearly" reflects the improper adjustments**

---

[5] Nexen's 2016 demand letters are attached to and referenced in the Complaint. (Pl.'s Comp. ¶ 19; Pl.'s Comp. Ex. C-1 and C-2.) They are therefore properly before this Court under Rule 12(b)(6).

[6] For purposes of this Motion, McMoRan accepts all well-pleaded facts as alleged by Nexen as true, but reserves and does not waive the right to dispute such "facts" at a later time.

- 1/1999:        Phillips sells interest in the Blocks to Newfield

- 9/1999        Newfield becomes operator of the Blocks

- 7/2007        Newfield sells interest in the Blocks to McMoRan

- 3/2008        <u>McMoRan</u> becomes Operator

- **9/2016        <u>Nexen raises the improper adjustments for the first time</u>**

Despite the glaring passage of time, and the many parties and persons that have by now come and gone, certainly some with first-hand knowledge of relevant facts, including facts related to the scope of the settled imbalances that would shed light on a justifiable explanation for the complained-of adjustments, Nexen contends that McMoRan, who is unfamiliar with the alleged "improper" adjustments and had no notice or knowledge of them during its entire eight-year tenure as operator, must *now* compensate Nexen under the cash settlement clause of the GBA.  Nexen's stale claim is barred, and its ill-conceived "cash settlement" argument does not withstand even minimal scrutiny.  For the reasons set forth below, Nexen's claim is subject to dismissal even taking all of its well-pleaded factual allegations as true.

### III. RULE 12(B)(6) STANDARD AND LIMITATIONS

**A.**      **The Court may consider the GBA, JOAs, and Gas Balancing Statements under a Rule 12(b)(6) standard.**

In deciding a Rule 12(b)(6) motion, a court must accept "well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted).  Generally, when considering a Rule 12(b)(6) motion, a court may not look beyond the pleadings.  Documents attached to a complaint or a Rule 12(b)(6) motion, however, are considered pleadings and may be reviewed under a Rule 12(b)(6) standard if they are (1) referenced in the complaint, and (2) central to the plaintiff's claims.  *Id.* at 205 (citing *Causey v. Sewell Cadillac-Chevrolet, Inc.,* 394 F.3d 285, 288

(5th Cir. 2004) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.").) "[W]hen a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim." *Peacock v. AARP*, 181 F. Supp. 3d 430, 434 (S.D. Tex. 2016).

The GBA, Nexen's demand letters, and several Gas Balancing Statements are attached to and referenced in Nexen's Complaint. As such, they are part of the pleadings. *Id.* ("Pleadings in the Rule 12(b)(6) context include attachments to the complaint.") In addition, the GBA attached to Nexen's Complaint references and is part of the parties' JOAs, and both the GBA and JOAs "constitute the contract" among the parties for the relevant Blocks. (*See* GBA, Exs. A and B to Pl.'s Comp. (making the GBA part of the JOA).) The JOAs and GBA, referenced in the Complaint, are central to Nexen's claims because they govern the respective duties of the parties with respect to their working interests in the 474 and 489 Blocks and the parties' rights to gas produced from the Blocks under the relevant leases. (*See* Pl.'s Comp. ¶ 9 (explaining that "[p]roduction from the leases was governed by various agreements, including operating agreements and balancing agreements").) Similarly, the Gas Balancing Statements, generated as required by the GBA, are central to Nexen's claims because they give rise to Nexen's alleged improper adjustment claim. (Pl.'s Comp. ¶¶ 10-13.) As such, the GBA, JOAs, Gas Balancing Statements, and Nexen's demand letters are part of the pleadings and may be considered by this Court in ruling on McMoRan's Rule 12(b)(6) Motion. The Court need not convert this Motion into a Rule 56 motion to consider the documents.

A complaint cannot survive a Rule 12(b)(6) motion when a plaintiff asserts only "conclusory statements" without "factual content" sufficient to allow "the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Moreover, while a court must accept all of the plaintiff's factual allegations as true, it is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.* To identify those statements that are merely conclusions, a court must "draw on its judicial experience and common sense," and, once identified, those unsupported conclusions "are not entitled to the assumption of truth." *Id.* at 679. Under these Rule 12(b)(6) standards, Nexen's Complaint must be dismissed.

**B.     Rule 12(b)(6) supports dismissal of Nexen's claims based on limitations.**

"A statute of limitations may support dismissal under Rule 12(b)(6) when it is evident from a plaintiff's pleadings that the action is barred and the pleadings fail to set forth or raise some basis for tolling or the like." *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003) (affirming dismissal of claim under Rule 12(b)(6) as barred). Courts apply the statute of limitations strictly, dismissing suits filed even a few days after the statute of limitations expires. *See Cochran v. Astrue,* No. 3:11-CV-1257, 2011 WL 5604024, at *1 (N.D. Tex. Nov. 17, 2011) (dismissing suit filed ten days after limitations under Rule 12(b)(6); *Williamson v. New Times, Inc.,* 980 S.W.2d 706, 710 (Tex. App.–Fort Worth 1998, no pet.) (affirming dismissal of libel claim filed four days after limitations expired); *Lowe v. Rivera*, 60 S.W.3d 366, 370–71 (Tex. App.–Dallas 2001, no pet.) (barring claim filed one day after limitations expired, where court was closed on day of expiration and plaintiff tried but failed to file petition on date of closure).

In Texas, breach of contract claims are subject to a four-year statute of limitations.[7] Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(3); *see also Smith Intern., Inc. v. Egle Group*, LLC, 490

---

[7] Under Article XXIV of the JOAs, the parties agreed that disputes "shall be subject to and interpreted in accordance with the general maritime law or in accordance with the laws, rules and regulations of the State of Texas, whichever is applicable." (*See* Exs. A and B at 47, Art. XXIV.) Because this is a breach of contract action with no relationship to maritime law and given that Texas is the state adjacent to the HI 474 and 489 Blocks, Texas law applies. *See* Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a)(2)(A) (stating that where "applicable and not inconsistent with" federal law, "the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States . . .

F.3d 386 (5th Cir. 2007). "The accrual of a breach of contract claim is governed by the legal injury rule." *Id.* at 387. Under that rule, "'a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and *even if all resulting damages have not yet occurred.*'" *Id.* (emphasis added) (quoting *S.V. v. R.V.*, 933 S.W. 2d 1, 4 (Tex. 1996)); *Hunton v. Guardian Life Ins. Co. of Am.*, 243 F. Supp. 2d 686, 698 (S.D. Tex. 2002). Thus, that damages have not yet materialized is inconsequential to the accrual analysis. The relevant inquiry focuses on the date on which the plaintiff had notice of injury or invasion of a right. *Smith Intern., Inc.,* 490 F.3d at 387 (describing legal injury as the invasion of a right). The question of when a cause of action accrues is a matter of law for the court to decide. *TIG Ins. Co. v. Aon Re., Inc.*, 521 F.3d 351, 355 (5th Cir 2008) (noting that a cause of action generally accrues and the "statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy.")

## IV. ARGUMENT

### A. Nexen's 21-year old claim is barred by the four-year statute of limitations.

Solely for purposes of this Motion, McMoRan accepts as true Nexen's allegation that Phillips wrongfully removed Canadian Occidental's gas underbalance in 1996.[8] But the Court also **must** assume that Canadian Occidental knew of the wrongful adjustment **in 1996**. The Complaint never alleges or even remotely suggests that Canadian Occidental was unaware of the adjustments to its imbalance account. To the contrary, Nexen directly acknowledges receipt, at

---

. "); *Rodrigue v. Aetna Cas. & Surety Co.*, 395 U.S. 352, 357 (1969); *Total E&P USA, Inc. v. Kerr-McGee Oil & Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013).

[8] Although, for purposes of McMoRan's statute of limitations' argument, McMoRan accepts as true Nexen's allegation of Phillips's wrongful adjustment of the gas balance account, McMoRan seriously questions whether this allegation otherwise meets the Rule 12(b)(6) "well-pleaded" fact standard because Nexen's Complaint is devoid of the factual content necessary to support its conclusory allegations.

the time, of the 1995 and 1996 Gas Balancing Statements reflecting the contested adjustments, and, indeed, Nexen attaches those documents to its Complaint. (Pl.'s Comp. Exs. C-1 and C-2.) The Gas Balancing Statements unequivocally establish that Canadian Occidental knew of the alleged discrepancy as early as March 25, 1996, as reflected by the date and time on which the reports were generated (noted on the statements).[9]

Presumably to excuse 21 years of inaction, Nexen alleges that it was not entitled to demand a cash settlement under the GBA for the *long-known*—but purportedly improperly removed—imbalance until cessation of production from the HI 474 and 489 Blocks. This argument simply misses the mark.

First, Nexen's allegation is that in 1996, whether inadvertently or intentionally, Phillips went beyond the terms of the 1995 Settlement Agreement (alleging no other imbalance settlement agreement covered the Blocks) and cleared out more gas imbalance accounts than allowed. Regardless of whether such an allegation supports a claim for breach of the Settlement Agreement, the GBA or both, the contractual "breach," if one occurred, occurred 21 years ago. In other words, however viewed—as an overreach by Phillips in alleged violation of the Settlement Agreement or as an alleged violation of the GBA due to Phillips's failure to report accurately "all over and short accounts"[10]—what is crystal clear is that Canadian Occidental had until 2000, at the latest, to assert its claim. The claim is now barred. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(3) (establishing a 4-year limitations period for breach of contract claims).

---

[9] All Gas Balancing Statements attached to the Complaint indicate the date and time on which the statements were generated and by whom. The information is located at the top right corner, and bottom left corner of the statements. (*See* Pl.'s Comp. at Ex. C-1, Dkt. 1-3, at 10-11, 18-23.)

[10] Pl.'s Comp. at Ex. A and B at Art. IV(A) (noting the operator's obligation to provide monthly gas balancing statements).

Simply put, under Texas law, Nexen's claim accrued in 1996, when the alleged wrongful conduct occurred; not 21 years later, when Nexen decided to provide notice of the alleged wrongful conduct to McMoRan for the first time, and demand payment. As already noted, in Texas, a claim for breach of contract accrues once a party suffers a legal injury, *even if all damages* have not yet materialized. *Smith Intern., Inc.,* 490 F.3d at 387. Legal injury is defined as "'an injury giving cause of action by reason of its being an invasion of a plaintiff's right.'" *Id.* (quoting *Murphy v. Campbell*, 964 S.W.3d 265, 270 (Tex. 1997).) Consequently, it is without consequence that cash settlement was not allowed under the GBA until 2016, when production ceased. Nor does it matter that it was not until then that McMoRan refused payment.

As the Fifth Circuit has explained, limitations start to run upon *notice* of wrongdoing, "which may be well *before* a third party takes any adverse action against the plaintiff." *TIG Ins. Co.*, 521 F.3d at 355 (emphasis added) (noting that plaintiff's claim had accrued even though damages had not materialized because plaintiff could have filed a declaratory judgment action at any time to clarify or determine the validity or extent of coverage under a certain policy even before coverage was denied and even before the underlying contract was rescinded, which resulted in damage to plaintiff). Thus, for example, in *Hoover v. Gregory*, the court found that the plaintiffs' breach of contract claim accrued when the plaintiffs became aware or should have become aware "that there was some concrete and specific *risk of harm* to their legally protected interests." 835 S.W.2d 668, 674 (Tex. App.—Dallas 1992, writ denied) (emphasis added) (affirming dismissal of claim as barred when plaintiffs sued more than four years after receiving notice of tax deficiency alerting them of tax exposure and potential claim against defendant).

The court explained that when documents "announce facts" from which an injury could be discovered, knowledge of such facts or receipt of documents with such information begins the

accrual period. *Id.* Because the Gas Balancing Statements announced to Canadian Occidental in 1996, that it was purportedly being "deprived of its right" to one and a half million MCF of gas, Canadian Occidental's claim accrued in 1996, giving it the right *at that time* and for the next four years to seek redress.

The fact that a cash settlement was not available in 1996, even if true, also does not save the day, because, at its core, the alleged deprivation of which Nexen complains is not a refusal by anyone to pay Canadian Occidental for its gas underbalance, but rather, the improper entire removal of its underbalance from the Gas Balancing Statements in 1996, an action that, if not timely corrected in the records of the parties' joint operations, would surely serve to prevent Canadian Occidental from demanding payment for the alleged wrongful deletion at some uncertain future date upon cessation of production. In other words, the alleged adjustments were not adjustments that occurred in the normal course of business or that accumulated under normal operations over the life of the relevant leases covering the Blocks. Instead, according to Nexen, they were a ***one time substantial and wrongful*** event that deprived it of its property in 1996. Nevertheless, Nexen and its predecessors did not seek redress for this impropriety in 1996 or in the 20 years thereafter.

Canadian Occidental and Nexen, as its alleged successor, received statements reflecting existing gas imbalances every single month after the 1996 "adjustments." (GBA at 6, Exs. A and B to Pl.'s Comp.) ("Operator shall furnish monthly, to each Party, a statement showing the status of all over and short accounts by Pricing Category). Several of these monthly statements are attached to Plaintiff's Complaint. (*See* Pl.'s Comp. at Ex. C.) From January 1996 to September 2016, Canadian Occidental (or its successor(s) in interest) had almost ***250 months*** (over 7,500 days and through at least two known large corporate transactions) to raise and resolve the

"incorrect statements." Canadian Occidental and Nexen did nothing. Instead, Nexen now asserts that the GBA effectively allows laches because it permits a cash-out at cessation of production. This argument does not pass muster.

**B.      The cash settlement clause is not exclusive and does not save Nexen's claim.**

Rule 12(b)(6) requires this Court to accept the veracity of Nexen's well-pleaded factual allegations. But willful blindness to the many timely opportunities Canadian Occidental (or its successor) had to resolve the alleged complete deletion of the sizable gas imbalance is not required. Rule 12(b)(6) also does not require the Court to ignore the various contractual and legal remedies available to Nexen and Canadian Occidental, which they either chose not to pursue or neglected to exercise for years. Indeed, the express provisions of the GBA, which Nexen conveniently omits from its Complaint, and which this Court properly may consider, reject Nexen's "cash settlement" justification outright.

Cash settlement for gas imbalances is not triggered under the GBA until there is a cessation of production from the Blocks, but cash settlement is *not the exclusive or even the preferred* remedy available for underproduction. The GBA provides a mechanism under which working interest owners may take gas in excess of their share of production. (*See* GBA at II(A), attached at Exs. A-B to Pl.'s Comp.) It also correspondingly provides each working interest owner with the **unilateral right** to demand recoupment of its gas underbalance **in kind at any time** from an overproduced working interest owner, who is **obligated** to share its gas production with the underproduced owner upon demand. (*Id.* at II(B)-(C).) This **in-kind** recoupment is not only available to all underproduced working interest owners, it is also the expressed preferred method for recoupment under the GBA: **"*Since it is the preference of the parties to balance each Party's gas production account [in kind] before the Block depletes,*** in the event an imbalance of gas

continues to exist in any Pricing Category," an overproduced party "*shall*, upon Operator's written request, make available to all Underproduced Parties" a share of its production for recoupment in favor of the underproduced parties. (*Id.* at II(C)(3); *see also id.* II(B).)

Thus, nothing prevented Nexen or Canadian Occidental from seeking timely to recoup the alleged gas underbalance in kind. And nothing prevented Nexen or Canadian Occidental from asserting a timely claim against Phillips had Phillips refused recoupment in kind. From January 1996, and for the following 20 years, Nexen and its predecessors had the freedom, opportunity, and contractual right to recoup the underbalance (if it existed) or to assert a claim upon the operator's refusal to honor their right to take in kind, subject, of course, to any applicable limitations period cutting off that right due to dilatoriness. Notwithstanding, Nexen and its predecessors sat idle.

Significantly, the parties' expressed preference for balancing in kind mirrors the custom and usage of the industry, which imposes a "rule favoring balancing in kind" to discourage "an underproduced party from alternatively demanding balancing in cash or in kind as the market favors him." *Pogo Producing Co. v. Shell Offshore, Inc.*, 898 F.2d 1064, 1066 (5th Cir. 1990) ("In short, balancing in kind is the preferred method of remedying underproduction."). Thus, only when in kind balancing is no longer available does the GBA or common law provide a method for balancing in cash. (*Id.* at II(C)(4); *Sun Operating Ltd. Partnership v. Murphy Oil Corp.*, 182 F.3d 914, at *3 (5th Cir. 1999) (interpreting GBA with similar cash settlement provision and finding that it applies only after in-kind balancing is no longer possible).) This ensures and "maximizes the ability of an underproduced party to balancing in kind until cessation of production makes that impossible . . . encourag[ing] full production of the reservoir." *Sun Operating Ltd. Partnership*, 182 F.3d at *3.

Here, the parties contractually stated their preference for in kind balancing during the productive life of the leases, providing a cash settlement option only for those remaining imbalances not previously recouped upon the permanent cessation of all gas production from the Blocks. Contrary to Nexen's assertions, nothing in the GBA required it to wait 21 years for a cash settlement. Therefore, under the express terms of the GBA, Nexen and its predecessor had an in-kind remedy available to them and their refusal to avail themselves of that available remedy—or their utter lack of diligence in pursuing any sort of redress—entirely forecloses Nexen's claim.

**C.      Nexen's claim is also barred by the provisions of the JOA.**

Article VII of the JOAs specifies the accounting procedure for the joint operations of the Blocks, obligating the operator to keep accurate records of all accounts, including costs, expenditures, charges and credits, in accordance with the Accounting Procedure set forth in Exhibit A to the JOAs. (Ex. A and B at 7, Art. VII.) The "Accounting Procedure" defines the term "Joint Account" as the "charges and credits accruing because of the 'Joint Operations,'" and in turn defines "Joint Operations" as the "operations necessary or proper for the development, operation, protection and maintenance of the Joint Property." (*See* Accounting Procedure at "Exhibit A" to the JOAs, which are attached hereto at Exs. A-B.)

The Accounting Procedure under the JOAs requires the operator to furnish the non-operating working interest owners with monthly statements "of all charges and credits to the Joint Account, summarized by appropriate classification." (*Id.*) It further specifically addresses adjustments to correct the statements furnished by the operator. (*Id.* at ¶ 4.) Under the adjustments clause (paragraph 4), a non-operating working interest owner must take "written exception" to protest or question any alleged error in the operator's statements and make a claim on the operator "for adjustment" within a twenty-four month period, absent which "all bills and statements . . .

shall conclusively be presumed to be true and correct." (*Id.*) Thus, the parties agreed that a two-year contractual limitations period would apply for the adjustment of any charge or credit reflected in the statements furnished by the operator. Under the plain language of the parties' contract, if a working interest owner receives an incorrect statement and then fails to take any action to protest it or to seek its correction within the allotted 24-month period, its claim will be barred. (*Id.*)

While the JOAs' Accounting Procedure does not expressly use the term "gas balancing statements" in the definition of the kind of "statements" the operator must furnish, there is no reason to believe the Accounting Procedure's broad definition of "statement" excludes those statements, which, by definition, reflect a gas "credit" to a party with an underbalance, as well as an "over" account for a party in overproduced status. To provide a measure of finality and certainty for all records concerning the joint operations of the Blocks, the parties agreed to a procedure affording all parties the right to dispute and seek the correction of a deficiency in the operator's reports and statements, imposing a hard and fast deadline to seek corrections. The parties' agreement to impose this strict two-year limitations serves multiple important purposes, one of which is to protect parties' rights when they transfer their lease interests, because determination of the purchase price for acquisition depends on outstanding liabilities, such as gas imbalances existing at the time of the transfer.

By this agreed procedure, the parties certainly did not express an intent to sanction a course of conduct that would allow a party to sit on an allegedly *improper* or *incorrect* Gas Balancing Statement for over two decades, in this case to the tune of millions of dollars.[11] Nevertheless, Canadian Occidental and Nexen sat quiet month after month and year after year, all the while

---

[11] While the Complaint does not allege a dollar amount for damages, it does allege the quantity of the alleged improperly-removed gas imbalance, which it contends was approximately 1,500,000 MCF of gas.

receiving purportedly grossly incorrect Gas Balancing Statements each and every month for an astounding 21-year period, missing the contractual two-year limitations by 19 years.

Accordingly, the contractual two-year limitations period set forth in the Accounting Procedure of the JOAs provides yet an additional reason to conclude that Nexen's claim is—and has been for quite some time—barred.[12]  *See Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1413 (5th Cir. 1993) (affirming dismissal of defendant's counterclaims for overcharges under the parties' JOA because the defendant had not challenged the disputed entries within the 24-month period noted in the JOA accounting procedure, and therefore its counterclaims were barred).

**D.      There is no alleged justification that would give rise to equitable tolling.**

Nexen's lawsuit is a prime example of the type of case that statutes of limitations were enacted to prevent.  Nexen cannot contend that the parties envisioned a situation where a working interest owner would receive Gas Balancing Statements on a monthly basis for years, ***even decades***, without that party having any risk of loss or other downside resulting from its failure to seek correction of alleged errors, especially of the magnitude asserted in this case.  According to Nexen, a party under the GBA is entitled to sit on a claim "known" only to it, for decades, only to assert it on whatever indefinite future date production happens to be depleted, in this case ***21 years later***, seeking compensation against whoever the unfortunate operator happens be to at the end of the day, who, as Nexen acknowledges on the face of its Complaint, is harnessed with  the additional misfortune of having no way of knowing that a claim like Nexen's might rear its ugly, dusty head,

---

[12]  McMoRan did not find a case on point discussing the JOA Accounting Procedure (which is recommended by the Council of Petroleum Accountants Societies of North America ("COPAS")) in the context of a gas balancing statement, but at least one court in Oklahoma that discussed a claim for improper adjustment of a gas balancing statement, explained that a gas imbalance entry is an "accounting entry," and that a cause of action for an improper gas balance adjustment (in the absence of a GBA) is for "accounting and gas balancing."  *Chaparral Energy, L.L.C. v. Pioneer Exploration, Ltd.*, 341 P.3d 1161, 1164 (Civ. App. Ok. 2010).

because even a diligent review of the records of the joint operations would not disclose its existence.  Such unconscionable conduct finds no sanction in the law or under the express terms of the GBA.  It also runs directly afoul of the policy behind limitations.

The very purpose of the statute of limitations is to preclude the filing of stale claims well after relevant evidence has been lost or the facts have been obscured by the passage of time.  As the Fifth Circuit has explained, limitation periods "reflect the valuable policy of requiring 'the prompt vindication of known rights to ensure that the defendant is not prejudiced as a result of lost evidence, fading memories, and disappearing witnesses.'"  *Jones,* 339 F.3d at 368 (quoting *Albertson v. T.J. Stevenson & Co.,* 749 F.2d 223, 232 (5th Cir. 1984) (noting that statute of limitations "are designed primarily to assure fairness to the defendants").)  "The application of statutes of limitations frequently compels courts to determine that the defendant's right to be free of stale claims prevails over the plaintiff's desire to prosecute those claims."  *Albertson,* 749 F.2d at 232.

The fact that Nexen may have a "meritorious" claim for the alleged improper removal of its gas imbalance and that the Court must assume the truth of such allegation does not change the analysis:

> Statutes of limitations are not directed to the merits of any individual case, they are a result of legislative assessment of the merits of cases in general. The fact that a meritorious claim might thereby be rendered nonassertible is an unfortunate, occasional by-product of the operation of limitations. All statutes of limitations provide ***some*** time period during which the cause of action is assertible. However, preclusion of a legal remedy alone is not enough to justify a judicial exception to the statute. The primary purpose of limitations, to prevent litigation of stale or fraudulent claims, must be kept in mind.

*S.V. v. R.V.,* 933 S.W.2d 1, 6 (Tex. 1996) (emphasis in original).  Under all well-pleaded facts, which this Court must accept as true, Nexen's claims, whether meritorious or not, are barred.

## V.  CONCLUSION

Based on the foregoing, McMoRan respectfully requests that its Motion be granted and the Nexen's claim for breach of contract be dismissed.

Date:   October 5, 2017

Respectfully submitted,

**JONES WALKER, LLP**

By: */s/ Alida C. Hainkel*
**Alida C. Hainkel**
Attorney-in-Charge
Louisiana State Bar No. 24114
SDTX Bar No. 313498
201 St. Charles Avenue, Suite 5100
New Orleans, LA 70170
Tel:  504.582.8600
Fax:  504.589.8602
ahainkel@joneswalker.com

**OF COUNSEL:**

**JONES WALKER, LLP**
811 Main, Suite 2900
Houston, Texas 77002

**C. Veronica Rivas**
Texas State Bar No. 24033127
SDTX Bar No. 36546
vrivasmolloy@joneswalker.com
Direct:  713.437.1830
Fax:  713.437.1810

**Krystal K. Scott**
Texas State Bar No. 24056288
SDTX Bar No. 860552
kscott@joneswalker.com
Direct:  713.437.1816
Fax:  713.437.1810

**ATTORNEYS FOR DEFENDANT,
MCMORAN OIL & GAS LLC**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the above and foregoing pleading was served upon all counsel of record through electronic notification via the Court's CM/ECF system on this 5th day of October, 2017.

*/s/ C. Veronica Rivas*
**C. VERONICA RIVAS**